IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

PATRICIA L. BROOKS,           )
                              )
            Plaintiff,        )
                              )
      v.                      )      No. 04-0084-CV-W-SOW
                              )
LABORATORY CORPORATION        )
OF AMERICA,                   )
                              )
            Defendant.        )

ORDER

Before the Court are defendant Laboratory Corporation of America's Motion for

Summary Judgment (Doc. #57), defendant's Suggestions in Support, plaintiff Patricia L. Brooks'

Suggestions in Opposition, and defendant's Reply.  For the reasons stated below, defendant's

motion is granted.

I.  Background

Defendant Laboratory Corporation of America ("LabCorp") moves for summary

judgment on plaintiff Patricia L. Brooks' claims that LabCorp unlawfully discriminated against

her in violation of Title VII and Section 1981 (Count I) and the Americans With Disabilities Act

("ADA")(Count II), created a hostile work environment, harassed her, and retaliated against her

in violation of 42 U.S.C. §1981 (Count III), and retaliated against her in violation of the Family

and Medical Leave Act ("FMLA")(Count IV).

The undisputed material facts relevant to the pending summary judgment motion are as

follows: defendant LabCorp hired plaintiff Brooks as a customer service representative in 1995.

1

She was interviewed and hired by LabCorp employee Todd Connery ("Connery"). Connery was the customer service manager for LabCorp from 1994 through 2003. Connery was Brooks' supervisor from the time she was hired by LabCorp until she returned from her FMLA leave in August of 2003. Lila Simmons ("Simmons") was the human resources manager for LabCorp in Kansas City, Missouri through August of 2002. Debora Chute ("Chute") has been the human resources manager for LabCorp in Kansas City since August of 2002.

A.    Plaintiff's Promotion to a Supervisory Position

At some time prior to July of 1998, the customer services supervisor under Connery's supervision accepted a new position in a different department. This left a vacancy in the customer services supervisor position. Connery requested that the position be filled via written application to human resources. The human resources department and Connery's supervisors approved filling the vacancy. Thereafter, LabCorp posted the position both internally and externally. Connery interviewed all of the applicants for the customer services supervisor position, including plaintiff Brooks. No one else was involved in interviewing the applicants.

Plaintiff Brooks claims that Connery interviewed, or said he interviewed, at least twenty applicants for the supervisor position. Connery had the final decision on who received the customer services supervisor position. Connery formulated a scoring system to assess the individuals interviewing for the customer services supervisor position. This system contained multiple subcategories upon which each applicant was graded. Connery scored plaintiff Brooks with a total of 76 points, the 7th highest score among those interviewed. The highest cumulative score of those interviewing for the position was given to Diane Kneif, an external candidate.

2

Therefore, Connery offered Kneif the position. Kneif declined the position because the offered salary was too low.

After Kneif rejected Connery's offer, Connery met with Simmons ("Simmons") and Leanne Blevins to discuss the vacancy. It was decided that the position would be offered to an internal candidate, either Sandy Sexton ("Sexton") or plaintiff Brooks. Sexton had scored the third highest score on Connery's applicant evaluation; however, she expressed a desire not to receive further consideration. At that point, plaintiff Brooks was offered the position and accepted it. The promotion was effective November 23, 1998.

It is undisputed that the position of customer services supervisor remained unfilled for a longer than usual period of time. Plaintiff Brooks alleges that when Connery offered her the supervisor position in November of 1998, he stated that he had interviewed over twenty people for the supervisor position, that he was offering the position to her, and that the delay between her interview and the offer had "nothing to do with race." In November of 1998, plaintiff discussed this allegedly racial statement only with her daughter. Aside from this statement, plaintiff never heard Connery make any other racially derogatory statements.

Plaintiff Brooks was offered the position of customer services supervisor at an annual salary of $38,000.00. Brooks believed that her credentials warranted an annual salary of $40,000.00. Plaintiff Brooks concedes that she is unaware of the annual salary received by her predecessor as customer services supervisor. Connery has testified that he offered plaintiff Brooks a higher annual salary than Kneif, notwithstanding the fact that Brooks had less experience than Kneif.

Plaintiff Brooks contends that the salary decision was not made by Connery alone.

3

Plaintiff Brooks states that the process at LabCorp was that the human resources manager, the lab manager, and the hiree's manager would decide as a group what the offered salary should be based upon the candidate's experience and education. Connery testified that LabCorp offered Brooks the customer services supervisor position, a position subordinate to his own, at nearly the same annual salary as he was earning at the time. It is undisputed that at the time plaintiff Brooks was offered the supervisor's position at an annual salary of $38,000.00, Connery was making $39,280.80. Therefore, plaintiff's requested salary of $40,000.00 would have given her a higher annual salary than her manager. Plaintiff adds, however, that after plaintiff accepted the supervisor's position, Connery received an interim raise of 7.7%, to $42,136.64, effective retroactively to May 10, 1998, six months before plaintiff Brooks' promotion.

At the time plaintiff told Connery that she felt she should receive an additional $2,000 in salary, according to plaintiff Brooks' testimony, Connery refused to go to human resources and request the additional salary money for her, saying that he could not support such a salary. Connery has testified that in response to this complaint about the offered salary, he contacted human resources to ascertain Brooks' relative salary in comparison to her peer group. Connery testified that when he contacted human resources, he was advised that plaintiff was being paid at the same rate and perhaps higher than her peers. It is undisputed that Connery advised plaintiff that she was being paid at the same rate and perhaps higher than her peers.

Despite this information, plaintiff states that she asked Connery if it would be okay for her to go to human resources about the salary. Plaintiff has testified that Connery told her that she could go, but he would not support her request. Plaintiff claims that she went to Simmons and asked about the salary situation. It is undisputed that Simmons asked human resources to

4

compare plaintiff Brooks' salary to salaries of comparable supervisors. Thereafter, human resources adjusted plaintiff Brooks' salary in April of 2001.

Plaintiff claims that in April of 2001, she told Simmons that she thought Connery was a racist. Defendant LabCorp disputes this asserted fact. Simmons testified plaintiff's complaint about Connery was that Connery did not give her due credit for the work she was doing. Simmons never testified that plaintiff made the allegation that Connery was a racist. Simmons testified that she thought there was a lack of mutual respect between Connery and Brooks. According to Simmons, Connery had similar issues with Caucasian male supervisors and Caucasian male managers.

B.    Connery's Alleged Disparate Treatment of Plaintiff Brooks

Brooks accepted the promotion to client services supervisor in November of 1998. In 1998, she was the only client services supervisor in LabCorp's Kansas City office. When she accepted the position, plaintiff Brooks became a salaried, exempt employee. Brooks knew when she accepted the position that it would require her to work more than forty hours per week.

As a customer services manager, Connery supervised two supervisory positions: one held by plaintiff Brooks and one held by Elaine Psaltis. Psaltis was the specimen management supervisor under Connery at that time. Although Psaltis and Brooks supervised different individuals, their departments had significant partnership and overlap with respect to client-based needs. Plaintiff Brooks alleges that she was treated differently than Psaltis because even though Psaltis ran her department inefficiently, Psaltis received better evaluations than plaintiff. Lila Simmons testified that plaintiff Brooks complained to her about Psaltis' performance, but Simmons never found validation for those complaints.

5

Brooks believes that Connery allowed Psaltis' department to continually operate in an inadequate, inefficient, actually negligent manner. Brooks admits that she has no idea how Psaltis was evaluated, only that documents show Psaltis was getting comparable or better reviews than plaintiff Brooks.

Brooks also claims that she was treated differently than Sandy Sexton because Sexton was not required to carry a pager on the weekends as plaintiff was often required to do. It is undisputed that Brooks' job description required her to carry a pager. Connery also carried a pager. Brooks claims that Sexton's job description required Sexton to carry a pager as well, but alleges that Connery did not make Sexton carry one. Brooks acknowledges that Sexton, at that time, was a part-time, hourly, non-supervisory, and non-exempt employee. In her brief, plaintiff Brooks adds that Sexton's status as a part-time, hourly employee does not alter Sexton's job description requiring her to carry a pager. Defendant LabCorp asserts that because Sexton was an hourly, part-time, non-supervisory, and non-exempt employee she is not a comparable employee to plaintiff Brooks. Plaintiff admits that Sexton is not a comparable employee, relying instead only on the job description.

C.    Plaintiff's 2000, 2001, and 2002 Evaluations

Connery evaluated his subordinates annually. He evaluated them on both subjective and objective criteria. Connery's first written evaluation of Brooks in her capacity as a supervisor is dated January 3, 2001, which covered year 2000. Connery gave Brooks a score of 81 for her 2000 evaluation which, on the evaluations then utilized, was characterized as "exceeds most performance standards." As a result, plaintiff Brooks received a 3.2% salary increase for 2001.

Thereafter, defendant LabCorp amended its evaluation forms and process. On the new

6

forms, LabCorp employee evaluations are scored and the range of scores correlate to a descriptive characterization of the employee's performance in the applicable time period. In 2001, LabCorp used an evaluation that characterized an employee's performance as "unacceptable," "acceptable," or "great." In 2002, LabCorp characterized an employee's performance as one of three categories: "unacceptable," "great," or "outstanding." All LabCorp employees earned merit increases in their salary unless the employee had an evaluation in the "unacceptable" range.

An evaluation score of 90-94 was characterized as "acceptable" in 2001, but as "great" in 2002. A score in the 90-94 range would earn the same merit increase in an employee's salary in both 2001 and 2002. The evaluation format utilized in 2001 and 2002 allowed the manager to award 20 discretionary points to the employee being evaluated.

For calendar year 2001, Connery awarded Brooks 18 out of the 20 discretionary points. Connery gave Brooks a score of 94 on her 2001 evaluation which was characterized as "acceptable." Therefore, Brooks received a 3.3% salary increase for 2002. Plaintiff asserts that if she had scored a 95, she would have received a larger salary increase. It is undisputed that plaintiff complained about her score; however, Lila Simmons agreed with the score and signed the evaluation. It is undisputed that Lila Simmons left LabCorp in August of 2002.

Connery signed Brooks' 2002 evaluation on November 7, 2002. Connery testified that the new evaluation format was utilized in 2001 before the managers and supervisors received training on its use by LabCorp. By November of 2002, Connery had received training on the new evaluation format. The training Connery received instructed all supervisors to avoid "recencies" (the tendency to put too much focus on recent occurrences) and "leniency" (the tendency to

7

inflate an evaluation in order to avoid conflict).  Connery testified in his deposition that he believes he probably exercised leniency in his evaluation of plaintiff Brooks in 2001.  Brooks' evaluation score in 2002 was a 90 which is characterized by LabCorp as "great."  As a result of her 2002 evaluation of "great," plaintiff Brooks received a 4% annual salary increase.

Connery testified that he rated plaintiff Brooks lower in 2002, compared to 2001, because Brooks: (a) did not complete four of her employee reviews on time; (b) failed to prepare training checklists for orienting new staff; (c) allowed too many persons in her group to be off work on the same day, resulting in inefficiency in their job; and (d) needed to be more decisive with her employees.  In the 2002 evaluation, Brooks received 16 of the 20 discretionary points, compared to receiving 18 of the 20 discretionary points awarded to her in 2001.  Connery testified that he awarded Brooks 16 of the 20 discretionary points because: (a) she was unavailable to her staff; (b) she needed to conduct more one-on-one training of her subordinates; ( c) she and Connery had poor communication at times; (d) she ignored Connery's request to provide help for training at another office; (e) she failed to meet her performance goals; (f) she failed to update her department's standard operating procedures; (g) she failed to organize and conduct meetings; and (h) she failed to set a threshold to evaluate LabCorp's process for notifying clients and care providers of abnormal lab results.

Brooks' salary increase in 2002 was greater than her salary increase in 2001, despite the lower numeric score on her 2002 evaluation.  Brooks believes that she was racially discriminated against and retaliated against because her 2002 annual evaluation was scored as a 90, or "great."

D.      Plaintiff's Written Complaint to Pat Noland

It is undisputed that Brooks wrote a letter to Pat Noland, the Vice President and General

8

Manager of the Midwest Region, in January of 2003, identifying various grievances she had with Connery. Brooks hand-delivered this letter to Noland some time after January 13, 2003. Among other things, plaintiff Brooks complained that the November 2002 evaluation of her was discriminatory and unfair. Plaintiff stated that her work environment was "filled with prejudice, intimidation and acts of retaliation." Plaintiff added that Connery treated her differently than other employees. Defendant notes that plaintiff's letter did not contain any references to racial discrimination.

Plaintiff Brooks claims that before she sent her letter to Noland, she had told Godfrey Duru, the Director of Compliance and Safety at LabCorp, that she thought Connery was a racist. According to Brooks, she and Duru talked about the fact that Duru also believed that Connery was a racist. Duru denies having such a conversation with plaintiff at any time. Duru testified in his deposition that plaintiff never told him that she thought Connery was a racist and that, if she had, he would have acted upon it. Duru denies ever telling plaintiff Brooks that he thought Connery was a racist.

Plaintiff met with Noland and Chute, the Human Resources Manager, to discuss the letter. Brooks believed that Chute would conduct an internal investigation into the grievances described in her January 2003 letter to Pat Noland. Chute has testified that as the Human Resources Manager, she investigated plaintiff Brooks' claims of discrimination as set out in the January 2003 letter to Noland. In the course of her investigation, Chute discovered that Brooks' salary exceeded the salary of other persons in comparable positions at LabCorp, namely Psaltis.

Approximately one week after the first meeting about plaintiff's complaints in her letter to Noland, plaintiff met with Chute to discuss the status of Chute's investigation. Brooks

9

testified that Chute told her that Chute's investigation revealed that Connery evaluated Brooks in the same or similar manner as he evaluated Psaltis.

On March 19, 2003, Connery noted that plaintiff Brooks was condescending towards Psaltis and, therefore, he counseled Brooks on her communications with her colleagues. On March 19, 2003, Connery instructed Brooks to take actions to be able to receive calls from the LabCorp office in Denver, Colorado. He advised plaintiff Brooks that the Kansas City office would begin receiving calls from the Denver office immediately and that Brooks should instruct her staff accordingly. Connery testified that, in response to his directions, plaintiff Brooks stated that she would not advise her staff of this development because she was already late leaving the facility.

Plaintiff contends that Connery, as he admitted in his deposition, knew about the possible "flood of calls" from Denver as early as the morning of March 18, 2003, when it was discussed in morning meetings. Plaintiff asserts that Connery waited until late on March 19, 2003, to inform plaintiff about the calls to be received from Denver beginning the following morning. Plaintiff Brooks states that she handled the situation by leaving her staff a message at 7:30 a.m. on March 20, half an hour before the switchboard was to open, about the calls to be received from Denver.

On March 20, 2003, Michelle Warnecke, the Divisional Director of Human Relations, met with Chute, Connery, and Brooks in the LabCorp office in Kansas City to discuss plaintiff's grievances about Connery. Defendant claims that this meeting was being held in an effort to determine what plaintiff Brooks was really complaining about and to determine how plaintiff was performing. According to defendant, the meeting was scheduled to commence at 9:45 a.m.;

10

however, plaintiff did not arrive until 9:55 a.m.  Plaintiff responds that she did not have a set

time to arrive at work and usually arrived between 9:00 a.m. and 10:00 a.m.  Plaintiff relies on

Connery's notes to suggest that the meeting had not been scheduled in advance, but rather was

scheduled earlier that morning before she arrived at work.  Plaintiff alleges that she was

criticized in the meeting for her handling of the call situation with Denver.

E.    Plaintiff Brooks' Quarterly Evaluation in 2003

        Connery gave Brooks a quarterly evaluation for the first quarter of 2003.  Connery

testified that although managers were encouraged to give quarterly evaluations in the past, there

was a stronger emphasis on doing them in 2003.  Connery created performance evaluation

standards for the two supervisors he supervised, plaintiff Brooks and Psaltis.  Plaintiff Brooks'

quarterly review was done on March 31, 2003.

        Connery's evaluation of Brooks' performance for the first quarter of 2003 resulted in a

score of 71.  Connery awarded Brooks 10 out of 20 available discretionary points on the quarterly

evaluation.  At the time of the 2003 quarterly evaluation, Connery did not know that Brooks had

written a letter to Pat Noland in January of 2003 in which she alleged that Connery had

discriminated against her.

        Quarterly evaluations are "mile-posts" and can be used by a manager when preparing the

employee's annual evaluation; however, the quarterly evaluation is neither determinative nor

predictive of the final, annual evaluation.  On March 31, 2003, Connery discussed with Brooks

placing her on a performance improvement plan ("PIP").  LabCorp's PIP is a tool used to educate

an employee about the company's expectations of the employee's performance and duties such

11

that the employee is afforded an opportunity to correct the behavior and earn a merit increase for that year.

It is undisputed that LabCorp's policies state that the Human Resources Department "should be used as a resource whenever a performance problem occurs with an employee." The policies also state that a PIP "should be put in place whenever performance is not at at acceptable level." It is undisputed that neither Chute nor the human resources department was "used as a resource" when Brooks was placed on a PIP. Chute explained that while human resources should be used as a resource, a supervisor is not required to use human resources as such.

In the PIP, Connery advised Brooks of the areas she needed to improve upon and, for the next few weeks, Connery and Brooks met regularly to discuss her progress. Brooks successfully completed the PIP and advised Connery that she felt good about completing this program.

F.      Personal Leave Bank Hours

Personal Leave Bank ("PLB") hours represent a standard number of hours that employees earn throughout the year and use to take off from work on a paid basis. LabCorp grouped vacation time, sick time, and holiday time into a pool of hours referred to as PLB. Brooks claims that she was racially discriminated against by Connery because he docked her PLB, but he did not dock the PLB of Sandy Sexton.

During the time Brooks asserts Connery did not dock Sexton's PLB, Sexton was a part-time, non-supervisory, and non-exempt employee. Brooks admitted in her deposition that Sexton was not a comparable employee to Brooks. Brooks does not have any knowledge that Connery treated anyone differently with respect to PLB hours. It is undisputed that Connery never allowed Sexton to take time off without utilizing her PLB hours.

G.    Plaintiff's 2003 FMLA Leave

Brooks went on medical leave on May 19, 2003. The purpose of this leave was so that plaintiff Brooks could undergo a gynecological procedure. Plaintiff Brooks returned from medical leave on August 11, 2003. Plaintiff does not have any complaints about the administration of her FMLA leave itself. When plaintiff Brooks returned to work in August of 2003, Connery was no longer her supervisor.

Brooks has testified that she was diagnosed with depression and anxiety while she was on FMLA leave. Defendant LabCorp states that plaintiff has not proffered any admissible evidence supporting such a diagnosis. It is undisputed that upon her return to work in August of 2003, plaintiff Brooks did not advise Connery or anyone else at LabCorp that she had been diagnosed with depression or anxiety.

In a release dated August 6, 2003, Brooks was released to return to work on August 11, 2003, for no more than four hours per day during her first two weeks back to work. The release stated that after the first two weeks, the doctor would re-evaluate plaintiff's ability to return to a full-time schedule. Chute found this release unacceptable for plaintiff to return to her position as the customer services supervisor. As explained by defendant, plaintiff's position of customer services supervisor was an exempt position that required as many hours per week as it took to get the job done.

Brooks admits that after Chute found the restriction of working only four hours per day unacceptable, plaintiff contacted the doctor to see if the restrictions could be modified. In a letter dated August 11, 2003, plaintiff's doctor stated that plaintiff Brooks could return to work on August 11, 2003, on a "trial basis." This letter did not contain any other restrictions. Another

13

letter dated August 11, 2003, stated that plaintiff Brooks could return to work on August 11, 2003 "on a schedule that would not exceed 40 hours weekly for her first month back at work." Chute found these releases unacceptable for plaintiff's position because plaintiff was not a "40-hour employee."

Plaintiff claims that Chute called Brooks' doctor and told the doctor that Brooks had to work 50-60 hours per week to return to her position with defendant. Brooks claims that she convinced her doctor to lift all restrictions because she was afraid of losing her job. In a letter dated August 13, 2003, plaintiff's doctor stated that plaintiff could return to work as of August 11, 2003, with no restrictions. Brooks also presented LabCorp with a letter from Creekwood Women's Care, LLC, dated August 11, 2003, which stated that Brooks could return to work on August 11, 2003, with a 25-pound weight lifting restriction.

Plaintiff claims that when she returned to work she was required to report to work at 8:00 a.m., "could not cry at work," and was prohibited from closing her office door. Defendant replies that many employees are required to be at work by 8:00 a.m. Defendant states that plaintiff's complaint that was prohibited from crying at work is taken out of context and is a reference to the fact that plaintiff was interrupting the work of other employees with crying spells. Finally, defendant states that plaintiff was not able to close her door because she was cutting herself off from her subordinates by having her door closed for extended periods of time and was denying others the ability to consult with her about job tasks.

When plaintiff returned to work in August of 2003, Chute met with Mary Long ("Long"), Brooks' supervisor at this time, to discuss LabCorp's expectations for Brooks. Chute and Long met with plaintiff Brooks on August 13, 2003 to discuss LabCorp's expectations of Brooks.

14

It was reported to Chute that Brooks, following her return to work on August 11, 2003, was seen crying in her office. Brooks admits that she was crying in her office. Her explanation is that she was crying because her colleagues were welcoming her back to work.

Barb Starks ("Starks"), a LabCorp employee, advised Chute that Brooks had come to her office, closed the door, and had a "meltdown." Starks further explained to Chute that Brooks was sobbing uncontrollably and complaining about work and stress and said that she "could not do this." Plaintiff claims that she went to Starks and expressed that she was being placed in a stressful situation because Debbie Bohnsack was trying to decide whether or not to accept the original limitations recommended by plaintiff's physicians. Plaintiff believes that the refusal of defendant to accept her physician's limitations in August of 2003 was because she had complained about Connery to Pat Noland in January of that year.

Godfrey Duru has been employed by defendant LabCorp for 25 years and is currently the Director of Compliance and Safety in the Kansas City office. Duru testified that plaintiff cried in his office and complained to him in August of 2003 when she returned from her FMLA leave, stating that the demands of her job were more than she had expected and that she did not feel as though Connery treated her fairly. Plaintiff denies having such a conversation with Duru in August of 2003. Duru stated that plaintiff told him that the pressure of her job was too much. Duru testified that he told Brooks she could take disability leave. Again, plaintiff denies ever having such a conversation with Duru. Duru reported to Chute that Brooks had come into his office and cried. He described plaintiff's condition to Chute as being visibly upset and crying uncontrollably. Duru told Chute that plaintiff Brooks was a "basket case." Duru indicated to Chute that plaintiff Brooks should not be at work and should not be supervising people.

15

Chute asked Brooks whether her physician understood her job description and whether she should have been allowed to return to work without restrictions. Plaintiff returned to her health care provider on August 19, 2003, for re-examination and re-evaluation. After plaintiff's physician's appointment on August 19th, the physician's office advised LabCorp that plaintiff should not return to work due to her health condition.

Brooks applied for and received short-term and long-term disability after her physician's office advised her that she could not return to work at LabCorp. Brooks admits that she was on disability and unable to work from August of 2003 through November of 2004.

According to Brooks, her disability consisted only of depression and a generalized anxiety disorder. Brooks claims that LabCorp regarded her as having a disability because she had taken FMLA leave, short-term disability leave, and long-term disability leave. Brooks has not been cleared to return to work without restrictions since August 19, 2003.

H.    Documents Retained by Plaintiff Brooks

Defendant LabCorp states that during the discovery process in this case, plaintiff Brooks produced nearly 2,000 documents in response to defendant's written request for production of documents. Among these documents were LabCorp's Quality Measure Report Cards, patient records, information on a particular medical group containing patient-identifying information, quality assurance data from LabCorp, and confidential company documents marked as such. Plaintiff admitted that she had taken these documents to her home and had not returned them to LabCorp. Chute and Duru have provided affidavits stating that plaintiff's employment would have been terminated at the time it was discovered that she had such documents in her possession at her home and that plaintiff would not be eligible for re-hire by LabCorp.

16

## II. Standard

A motion for summary judgment should be granted if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Rafos v. Outboard Marine Corp.</u>, 1 F.3d 707, 708 (8th Cir. 1993) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact for trial and that the movant is entitled to summary judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A party opposing a properly supported motion for summary judgment may not rest upon the allegations contained in the pleadings, "but must set forth specific facts showing there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In reviewing a motion for summary judgment, this Court must scrutinize the evidence in the light most favorable to the non-moving party, according the non-moving party the benefit of every factual inference and resolving any doubts as to the facts or existence of any material fact against the moving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158 (1970).

## III. Discussion

### A. Plaintiff's Title VII and Section 1981 Discrimination Claims in Count I of her Complaint

In Count I of her Complaint, plaintiff alleges that she was discriminated against based upon her race. Pursuant to Title VII, in order to establish a *prima facie* case of race discrimination, based upon disparate treatment, plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) a non-member of the protected class was not subjected to the adverse employment action.

17

Smith v. Datacard Corp., 9 F.Supp.2d 1067, 1079 (D. Minn. 1998)(citing McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973)).  An "alleged adverse employment action must be one that produces a 'material employment disadvantage . . .' such as 'termination, cuts in pay or benefits, and changes that affect an employee's future career prospects . . . .'" Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1017 (8th Cir. 1999)(citations omitted).  In comparing the plaintiff to a non-member of the protected class, the "individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000)(citing Lynn v. Deaconess Med. Center - W. Campus, 160 F.3d 484, 487-88 (8th Cir. 1998)).

To establish a race discrimination case under Section 1981, plaintiff must "prove discriminatory intent" and she must establish that (1) she is a member of a protected class; (2) she is qualified for the position; (3) an adverse employment action; and (4) some evidence that would allow the inference of improper motivation. Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 258 (8th Cir. 1996).  The analysis of plaintiff's Title VII and Section 1981 claims is the same. Therefore, they will be addressed jointly.

Plaintiff's Title VII and Section 1981 race discrimination claims against defendant LabCorp are not supported by any direct evidence of racial animus.  The only statement concerning race in this case was Connery's alleged volunteered statement to plaintiff that the delay in offering her the promotion to a supervisor's position "had nothing to do with race."  This statement does not rise to the level of comments that have triggered Title VII protection. *See, e.g.*, Rollins v. Missouri Dept. of Conservation, 315 F.Supp.2d 1011, 1019 (W.D. Mo. 2004);

18

Smith v. Datacard Corp., 9 F.Supp.2d at 1079; Simmons v. OCE-USA, Inc., 174 F.3d 913, 915-16 (8th Cir. 1999). In addition, this alleged comment was made by Connery in 1998 at the time plaintiff was receiving a promotion. Plaintiff's first complaint of disparate treatment was made in 2001, nearly three years later. "Stray remarks 'that are remote in time do not support a finding of pretext for intentional discrimination.'" Simmons v. OCE-USA, Inc., 174 F.3d at 916.

Furthermore, plaintiff fails to identify any evidence supporting a *prima facie* case of race discrimination as she did not suffer an adverse employment action. Plaintiff was promoted in November of 1998. It is undisputed that she was the 7th-ranked candidate among those who applied and were interviewed. Nevertheless, plaintiff was offered the promotion when higher-ranked candidates declined the position or withdrew from consideration. Any delay in promoting plaintiff Brooks cannot be characterized as an adverse employment action under these circumstances.

Plaintiff alleges in her First Amended Petition that she was discriminated against based upon her race because she was paid less than her Caucasian counterparts. There is no evidence to support this claim. Plaintiff had admitted that she had no idea what her predecessor as customer services supervisor was making. Furthermore, at the time plaintiff was offered the position and requested a $40,000 salary, Connery, her manager, was only making approximately $39,000. In addition, Connery testified that he offered plaintiff Brooks more than he had offered the 1st-ranked candidate for the same position, a Caucasian female. Finally, when plaintiff brought salary concerns to Connery and Simmons, it resulted in a pay increase for plaintiff in April of 2001. Plaintiff has not identified any evidence indicating that she had Caucasian counterparts who were being paid more than her for comparable work. In fact, to the contrary, it is undisputed

that when Chute was investigating plaintiff's complaints to Noland in 2003, Chute determined that plaintiff was being paid more than Psaltis, who appears to be the most similarly situated supervisor to plaintiff Brooks.

Next, plaintiff Brooks identifies Connery's evaluations of her as adverse employment actions. Brooks admits that her evaluation in 2001 was scored as a 94 which was characterized as "acceptable" and her evaluation in 2002 was scored as a 90 which was characterized as "great." In both years, plaintiff received merit increases based upon her evaluation scores. In fact, her merit increase in 2002 was greater than the one she received in 2001 despite the lower numeric score. Therefore, plaintiff cannot establish an adverse employment action based upon her annual evaluations for the years 2001 and 2002. LaCroix v. Sears, Roebuck, and Co., 240 F.3d 688, 692 (8th Cir. 2000); Cossette v. Minnesota Power & Light, 188 F.3d 964, 972 (8th Cir. 1999)("negative evaluation does not by itself constitute an adverse employment action . . . ."). There was no alteration in the terms and conditions of plaintiff's employment based upon either of these annual evaluations other than an *increase* in plaintiff's salary.

Plaintiff has also alleged that she was forced to use her PLB hours when Sexton, a Caucasian employee, was not required to use such hours. Plaintiff has admitted, however, that Sexton was not a comparable employee during the relevant time period because Sexton was an hourly, non-exempt, part-time employee. Plaintiff has not adduced any evidence that Connery treated other Caucasian supervisors more favorably than plaintiff. In fact, plaintiff does not even address this claim in her suggestions in opposition to defendant's motion for summary judgment. Therefore, the Court assumes that plaintiff had abandoned this claim.

Plaintiff also alleges that she was discriminated against because she was required to carry

a pager on the weekends, but Sandy Sexton was not required to carry one. Again, Brooks has admitted that Sexton was not a comparable employee at the time. In addition, once plaintiff decided that the situation was unfair, she helped establish a pager schedule that required both exempt and non-exempt employees to carry a pager at certain times. Plaintiff Brooks implemented this new system with Connery's approval. There was no adverse employment action taken against plaintiff based upon these facts.

Plaintiff has identified the 2003 quarterly evaluation as another basis for her discrimination claims. This quarterly evaluation had no impact on plaintiff's salary or the terms and conditions of her employment. It cannot constitute an adverse employment action as a matter of law. See LaCroix, 240 F.3d at 692; Spears v. Missouri Dept. of Corrections & Human Resources, 210 F.3d 850, 854 (8th Cir. 2000)("a negative review is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms and conditions of the recipient's employment").

Similarly, placing plaintiff Brooks on a PIP does not qualify as an adverse employment action. It is undisputed that in April of 2003, Connery placed plaintiff Brooks on a four-week PIP. Plaintiff Brooks successfully completed the PIP. Neither during the four-week PIP nor after its completion were the terms or conditions of plaintiff's employment altered in a negative manner.

Plaintiff Brooks has alleged that she was discriminated against based upon her race because when she returned from her FMLA leave in August of 2003, she was advised that her supervisor's position required full-time attendance, most likely in excess of forty hours per week. Plaintiff also faults defendant for telling her that she had to report to work at 8:00 a.m., had to

leave her office door open, had three additional employees assigned to her department, and could not have crying spells at work. As an initial matter, none of these requirements by plaintiff's employer qualify as adverse employment actions. Furthermore, plaintiff has failed to identify any evidence suggesting that these requirements were imposed upon her because of her race. Similarly, plaintiff has failed to identify any similarly-situated Caucasian supervisors who were treated more favorably than her in these areas. Defendant LabCorp's actions in informing plaintiff of these expectations do not even suggest that plaintiff was subjected to disparate treatment based upon her race.

It is worth noting that when plaintiff returned to work in August of 2003, she had a new supervisor. The addition of three employees to her department presumably occurred while she was on leave. The requirement that she arrive at work promptly at 8:00 a.m. could have been instituted by her new supervisor as neither party makes this clear in the record. As for leaving her door open and refraining from having crying spells at work, these "new requirements" were apparently added after plaintiff repeatedly interrupted the work of other employees to have crying spells in their offices. None of these so-called new requirements shows any retaliation by defendant for plaintiff's use of FMLA leave during the summer of 2003.

B.    Plaintiff's Title VII and Section 1981 Retaliation Claims in Count I

In order to establish Title VII retaliation, plaintiff must establish that (1) she engaged in a statutorily protected activity, (2) her employer subsequently took an adverse employment action against her, and (3) the adverse employment action was causally linked to her protected activity. Palesch v. Missouri Com'n on Human Rights, 233 F.3d 560, 569 (8th Cir. 2000). Plaintiff never complained about Connery's remark in November of 1998 about the delay in offering her the

22

promotion having "nothing to do with race." As such, it cannot be considered a protected activity.

Plaintiff's letter to Pat Noland in January of 2003 qualifies as a statutorily protected activity. Plaintiff complained to Noland about "prejudice, intimidation and acts of retaliation," "discriminatory actions," and "inequitable actions." The Court does not find it dispositive that plaintiff did not use the word "race" when complaining that she was being subjected to discrimination and retaliation.

Nevertheless, plaintiff's claim fails because she cannot identify an adverse employment action that occurred after she sent her letter to Noland. Plaintiff is also unable to identify any evidence suggesting that any alleged adverse employment action was causally linked to her letter to Pat Noland. Neither the first quarter review nor the PIP constituted adverse employment actions against plaintiff for the reasons discussed above. Accordingly, plaintiff's retaliation claims fail.

C.    Plaintiff's Claim of ADA Discrimination in Count II

Plaintiff cannot state a claim under the Americans With Disabilities Act ("ADA") because there is no evidence that plaintiff was a disabled, qualified person who could, with or without reasonable accommodation, perform the essential functions of her job as customer services supervisor in August of 2003. In order to state a claim under the ADA, plaintiff must prove that: (1) she is disabled within the meaning of the ADA; (2) that she is qualified to perform the essential functions of the job at issue either with or without reasonable accommodation; and (3) that they suffered an adverse employment action because of the alleged disability. Conant v. City of Hibbing, 271 F.3d 782, 784 (8th Cir. 2001). Plaintiff alleges in her Complaint that she

23

suffered from "a mental impairment in the form of depression and generalized anxiety disorder, which substantially limited one or more of the major life activities of thinking, concentrating, interacting with others, and working, among others, although plaintiff was capable of performing the essential functions of her job at all times relevant to this action."

Plaintiff concedes in her brief that she was "not disabled when she returned to work" in August of 2003. Instead, she takes the position that she was regarded as disabled. There is no evidence that defendant LabCorp regarded plaintiff as disabled when she returned to work in August of 2003.

Plaintiff makes the point that she just needed to "ease back into" her supervisor's position by being allowed to work four hour days; however, given plaintiff's contention that she was regarded as disabled, she was not entitled to such an accommodation. "'[R]egarded as' disabled plaintiffs are not entitled to reasonable accommodations . . . ." Weber v. Strippit, Inc., 186 F.3d 907, 917 (8th Cir. 1999).

The evidence is that plaintiff took FMLA leave beginning in May of 2003 for gynecological surgery. When she returned to work in August of 2003, she presented defendant with a note from a doctor stating that she was released to return to four-hour work days for the first two weeks. It is undisputed that plaintiff's position as customer services supervisor was not a part-time position.

A major requirement of the ADA is that one must be a "qualified individual." That means one can perform the essential job functions of the position. Hatchett v. Philander Smith College, 251 F.3d 670, 674 (8th Cir. 2001). One essential job function is attendance at work. Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1999). An employee who has a

24

full-time position, but who is only able to return to work on a part-time basis, is not qualified to perform the essential functions of their full-time position. Hatchett, 160 F.3d at 673-75. Defendant LabCorp was not required to allow plaintiff to return to work on a part-time basis on the potential for her to recover and be able to resume her supervisor's position full-time at some unknown time in the future. This is particularly true in this case where plaintiff concedes that she was not disabled, but merely regarded as being disabled. As discussed above, "regarded as" plaintiffs are not entitled to accommodation.

Furthermore, plaintiff has not identified any evidence suggesting that defendant regarded her as having a disabling impairment. The general rule is that a person is regarded as having such an impairment if others treat her as if she is disabled. Cody v. CIGNA HealthCare St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998).

In this case, Chute was presented with an array of medical releases by plaintiff. First, Chute was informed that plaintiff was restricted to four-hour work days. Then, Chute was advised that plaintiff was restricted to no more than forty hours per week. Finally, plaintiff produced a full release with no restrictions.

After plaintiff returned to work, Chute was advised by both Barb Starks and Godfrey Duru that plaintiff Brooks had come into their offices, on separate occasions, closed their respective doors, and cried uncontrollably. Less than one week after being cleared to work with no restrictions, plaintiff returned to her physician's office on August 20, 2003. After that visit, plaintiff's physician advised LabCorp that Brooks could not work at all. There is no evidence that plaintiff was treated as disabled during the time period that she worked in August of 2003. Plaintiff cannot establish a *prima facie* case of ADA discrimination.

25

As a result, plaintiff's claim of constructive discharge as a result of an ADA violation also fails.  Cody v. CIGNA HealthCare of St. Louis, Inc., 139 F.3d at 598.  Plaintiff's ADA claims fail as a matter of law.

D.      Plaintiff's Hostile Work Environment, Harassment, and Retaliation Claims in Count III of her Complaint

In order to state a claim under a hostile work environment theory, plaintiff must establish that: (1) she is a member of a protected group; (2) she was subjected to unwelcome race-based harassment; (3) there is a causal nexus between the harassment and her race; and (4) the race-based harassment affected a term, condition, or privilege of employment.  Rollins v. Missouri Dept. Of Conservation, 315 F.Supp.2d 1011, 1027 (W.D. Mo. 2004)(citing Elmahdi v. Marriott Hotel Services, Inc., 339 F.3d 645, 652 (8th Cir. 2003)).

Plaintiff has not identified any evidence that she was subjected to unwelcome race-based harassment.  Connery never made any statements or took any actions that could be construed as harassment based upon plaintiff's race.  Plaintiff has complained about workplace issues that have nothing to do with race based upon the record before the Court.

As discussed above, plaintiff has failed to identify evidence to support a retaliation claim. Count III of plaintiff's Complaint fails as a matter of law.

E.      Plaintiff's Claim of Retaliation for Exercising FMLA Rights in Count IV

A *prima facie* claim for FMLA retaliation requires plaintiff to establish that her FMLA leave was the determinative factor in the employment decision at issue: plaintiff's discharge. Hatchett, 251 F.3d at 677.  An employee is not entitled to retention of his or her job at the end of FMLA leave if he or she is unable to perform the essential functions of the job.  Id.

26

Plaintiff took FMLA leave from May of 2003 through August of 2003 for a gynecological procedure. Plaintiff admits that she has no complaints about the administration of her FMLA leave. By August 11, 2003, plaintiff had presented defendant with a note stating that she could return to work with no restrictions. On August 19, 2003, plaintiff saw her physician. After that visit, plaintiff's physician informed defendant LabCorp that plaintiff was unable to return to work on any basis. Plaintiff had used her entire twelve weeks of FMLA leave and was owed no further protection under FMLA.

Plaintiff has failed to identify any evidence suggesting that defendant retaliated against her for using FMLA leave in 2003. Plaintiff claims that defendant's refusal to allow her to return to work for four hours per day was retaliatory; however, plaintiff's position required the ability to work more than forty hours per week. Plaintiff also points to the "new conditions" imposed on her when she returned to work, primarily that she arrive at work by 8:00 a.m. each day, keep her office door open, and refrain from crying spells, as retaliatory conditions. For the reasons previously discussed, these were not retaliatory actions.

F.     After-Acquired Evidence

The Court need not address defendant's arguments about after-acquired evidence of wrong-doing by plaintiff Brooks because plaintiff's claims fail as a matter of law.

27

IV.  Conclusion

For the reasons stated above, it is hereby

ORDERED that defendant Laboratory Corporation of America's Motion for Summary

Judgment (Doc. #57) is granted and judgment is entered in favor of defendant.  It is further

ORDERED that the Clerk of the Court shall enter final judgment at this time.

/s/Scott O. Wright
SCOTT O. WRIGHT
Senior United States District Judge

Dated: 9-15-05

28